UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                               :

MARK C. HOLLENBAUGH,           :       CASE NO. 5:05-CV-207
Administrator of the Estate of     :
Joel Hollenbaugh deceased,       :
                               :
        Plaintiff,           :
                               :
vs.                            :       OPINION & MEMORANDUM
                               :       [Resolving Doc. Nos. 104, 106]
THOMAS G. MAURER,           :
SHERIFF, WAYNE COUNTY, *et al.*,  :
                               :
        Defendants.        :
                               :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On February 4, 2005, Marc C. Hollenbaugh, on behalf of the estate of Joel Hollenbaugh, sued Thomas G. Maurer and others for events relating to Joel Hollenbaugh's death.  The plaintiff brings his claim under 42 U.S.C. § 1983, alleging the defendants violated Joel Hollenbaugh's Fifth, Eighth, and Fourteenth Amendment rights by failing to provide necessary medical care during Hollenbaugh's arrest and detention on May 27, 2003.  The plaintiff also asserts various state law claims.

On August 1, 2005, Defendants City of Wooster and Scott Rotolo filed a motion for summary judgment as to the plaintiff's § 1983 claims. [Doc. No. 104].  On that same day, Defendants Wayne County, Thomas G. Maurer, Cheryl A. Noah, Ann M. Obrecht, Scott Wiggam, Nancy Ott, Patricia Schuler, Louis Johns, Douglas Johnson, and Michael Butler, also filed a motion for summary judgment. [Doc. No. 106].

-1-

Case No. 5:05-cv-207
Gwin, J.

With their motions, the defendants argue that the plaintiff cannot point to sufficient evidence that Hollenbaugh's constitutional rights were violated, that the plaintiff cannot show that the city and county defendants had a policy or practice resulting in Hollenbaugh's death, and that the named defendants are entitled to qualified immunity.  In the event that the Court dismisses the plaintiff's federal claims, the defendants also ask the Court to decline to exercise jurisdiction over the plaintiff's state law claims.  The plaintiff opposes these motions. [Doc. No. 122].

For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part the Defendants' motions for Summary Judgment.

## BACKGROUND

The plaintiff alleges several violations of Hollenbaugh's constitutional rights.  He claims the defendants failed to provide adequate care to Hollenbaugh during an arrest and detention on May 27, 2003, and that this led to his death when symptoms of a heart attack were not treated.  As set forth below, the parties dispute many of the events that allegedly occurred that night.

I.      Description of the Parties

Of the 13 defendants in this case, the plaintiff sues 6 in their individual and official capacities.  Scott Rotolo, a Wooster Police Officer, is the only City of Wooster defendant.  The other defendants were employed by the Wayne County Sheriff's Department.  From Wayne County, the plaintiff first sues retired Sergeant Nancy Ott.  At the time of the events in question, Ott was the Sergeant in charge of the Wayne County Jail.  Wayne County Defendants Michael Butler, Louis Johns, Patricia Schuler, and Douglas Johnson were also at the jail that evening.  Johnson, the Captain of the Wayne County Jail, was allegedly at the jail for only 25 to 30 minutes that night.  Butler, a Sergeant, was the second highest ranking officer on duty.  Johns and Schuler both held the

Case No. 5:05-cv-207
Gwin, J.

rank of deputy and reported directly to Ott.

The remaining named defendants include Wayne County Sheriff Thomas Maurer and Commissioners Cheryl A. Noah, Ann M. Obrecht, and Scott Wiggam, as well as the Mayor of Wooster, James A. Howey. These individuals were neither at the Wayne County Jail on the night in question nor had any contact with Hollenbaugh. The plaintiff sues them only in their official capacities. Finally, the plaintiff also sues Wayne County and the City of Wooster.

II.     The Arrest, Detention, and Subsequent Death of Joel Hollenbaugh

At approximately 5:08 pm on May 27, 2003, Hollenbaugh and his associate, Sharon Brewer, were involved in a minor traffic accident in Wooster, Ohio. Defendant Rotolo arrived at the scene at 5:16 pm. At that time, he observed Brewer in the driver seat and Hollenbaugh in the passenger seat of a U-haul vehicle. The driver of the other vehicle told Officer Rotolo that she believed Hollenbaugh had been driving the U-haul at the time of the accident and that he and Brewer had switched seats after the accident. When questioned, Brewer claimed that she had been driving. Rotolo says that he noticed an overbearing smell of body odor and a trace of alcohol emanating from the U-haul, but  was not sure of the exact source of the odors. At that time, Rotolo allowed Hollenbaugh and Brewer to leave the scene.

Around one hour later, Rotolo went to Brewer's residence to continue his investigation. Once there, he found Hollenbaugh in the bathroom, allegedly smelling of alcohol. Hollenbaugh told Officer Rotolo that he did not feel well and that he had the flu. Rotolo led Hollenbaugh outside of the apartment complex for questioning. Hollenbaugh allegedly stated he had consumed a couple of beers and appeared to be swaying and could not keep his balance. Rotolo then performed several field sobriety tests on Hollenbaugh and observed signs of intoxication. During the tests,

-3-

Case No. 5:05-cv-207
Gwin, J.

Hollenbauch continued to tell Rotolo that he did not feel well and that he had diarrhea and a headache.  Rotolo then arrested Hollenbaugh and transported him to the Wayne County Jail.  Upon arriving at the jail at approximately 6:30 pm, Rotolo and another Wooster Police Officer "Goon" escorted Hollenbaugh to the booking counter.

According to the defendants, approximately 20 minutes passed between the time that Rotolo first escorted Hollenbaugh to the booking counter and the time that Johns and Butler carried Hollenbaugh into the jail's breath test or blood alcohol content testing room ("BAC room").  During that time, Wayne County defendants Ott, Johns, Butler, Schuler, and Johnson all had contact with Hollenbaugh.

Schuler was allegedly behind the booking counter when Hollenbaugh came in.  At that time, she asked Hollenbaugh the required booking questions.  The defendants claim she had no further contact with Hollenbaugh.  Johnson allegedly had similarly limited contact with Hollenbaugh.  Johnson claims that he stopped by the jail around 6:15 pm to wish Ott a happy retirement, as it was her last night.  Johnson left at approximately 6:45 pm.[1]

Along with Schuler and Johnson, Defendants Ott and Butler were at the counter when Rotolo brought Hollenbaugh in.  While Butler patted him down, Hollenbaugh stated again that he had the

---

[1] Apparently, the defendants were having a retirement celebration for Ott that night.  The plaintiff tries to shape the event as a party and suggests that the defendants were cooking food and eating throughout the night.  However, the Court finds the testimony the plaintiff cites does not support this conclusion.  Specifically, the plaintiff points to the deposition testimony of Defendant Johns and Johnson.  *See* Johns dep. 42-47, May 12, 2005; Johnson dep. 43, May 11, 2005.  These defendants stated only that they had brought food in to eat for dinner.  Defendant Johns said he thought there may have been cake.  Johns dep. 42:15.  However, neither defendant said anything about a party.  Nor does the defendants' testimony allude to an "entire party-like atmosphere" as the plaintiff suggests.  Pl.' Resp. Summ. J. at 3.

Case No. 5:05-cv-207
Gwin, J.

flu and was going to be sick.[2/]  Hollenbaugh also said he needed to go to the hospital.[3/]

Kelsey Amos, who was detained in the jail holding cell on the night in question, claims that when Rotolo first brought Hollenbaugh up to the booking counter, Hollenbaugh was having trouble standing and Rotolo was supporting him.  Amos also stated that Hollenbaugh passed out or slumped down a couple of times and that Rotolo and two sheriff's deputies supported him at different times by holding his arms.[4/]  In contrast to Amos' testimony, Defendant Butler claims that Hollenbaugh asked to sit down and that Butler assisted him to prevent him from falling.[5/]

Butler then relayed Hollenbaugh's answers to the booking questions to Schuler.  The defendants say that Hollenbaugh did not respond to most of the questions, including those relating to his medical history.  They also allege that he had been in the Wayne County Jail twice within the prior 6 months and both times  reported no medical conditions.

While Schuler questioned Hollenbaugh, Defendant Johns entered the room.  Also, at some point during the questioning, Ott left to check the women's shower room.  Upon returning, she saw that Hollenbaugh was lying flat on his back on the floor and heard him say that his chest hurt.[6/]  Ott attempted to take Hollenbaugh's blood pressure three times, using a blood pressure cuff.   The defendants claim that each time, Hollenbaugh flailed his arm and rolled over, causing the machine to read "error."

---

[2/] See Johnson dep. 55:10-55:12; Butler dep. 74:2-74:17, May 11, 2005.

[3/] Butler dep. 74:19.

[4/] Amos dep. 13, 70-74.

[5/] Butler dep. 79-80.

[6/] Ott dep. 158:23, May 10, 2005; Johnson dep. 73:25-74:1.

Case No. 5:05-cv-207
Gwin, J.

Ott testified that she put the cuff on Hollenbaugh's left arm while he was lying on the ground, but that when it was beginning to deflate he threw his arm to the right and rolled over on his side.[7] Ott rolled him back flat on the ground and tried to test his blood pressure a second time. She claims that Hollenbaugh rolled over again, preventing her from obtaining a reading. At first, Ott testified that while this was going on Hollenbaugh's eyes were closed.[8] However, she later revised her statement, alleging that his eyes were not completely closed, but rather that he was peaking at her. Ott maintains that Hollenbaugh was merely pretending to be ill or to have passed out.[9] On the third attempt, Johns helped keep Hollenbaugh steady on the ground so that he could not roll over. Johns apparently held Hollenbaugh's wrist down while Ott pressed on Hollenbaugh's shoulder. The blood pressure machine read error this time as well.[10]

After the third attempt, Defendant Butler tried to manually obtain Hollenbaugh's pulse by placing two fingers on Hollenbaugh's carotid artery. Butler claims that Hollenbaugh kept pinching his neck down to try to interrupt the process, but that Butler was still able to obtain a pulse for about 5 seconds. From this reading, he says that Hollenbaugh's pulse was between 70 to 80 beats per minute. The plaintiff points out, however, that Butler was not looking at a clock when taking Hollenbaugh's pulse. In fact, Butler testified that he is not sure if he actually felt a pulse for 5 seconds and that he merely estimated that to be the time period.[11]

---

[7] Ott dep. 169:2-169:20.

[8] *Id.* 172:16.

[9] *Id.* 173-174.

[10] *Id.* 178-180.

[11] Butler dep. 99:18-99:24.

Case No. 5:05-cv-207
Gwin, J.

The defendants claim that Butler and Johns then carried Hollenbaugh into the BAC room so that Officers Rotolo and Goon could administer a breath test. Jail detainee Amos alleges he saw the officers dragging Hollenbaugh past his cell at that point.[12/] The defendants placed Hollenbaugh in a chair and he slumped down and put his feet up on Officer Goon's chair. Officer Goon allegedly pushed Hollenbaugh's feet off of the chair and Hollenbaugh fell to the floor, hitting his head on the wall. The officers then placed Hollenbaugh back in the chair and Defendant Johns stood in front of him to keep him steady.[13/] Officer Rotolo at some point described Hollenbaugh as slipping in and out of consciousness although he later recanted this in his deposition testimony.[14/] Instead, Rotolo claimed at that point that Hollenbaugh was intermittently opening and closing his eyes.[15/] In any case, Officer Rotolo read Hollenbaugh the instructions regarding the breath test and asked him to consent. Hollenbaugh did not respond and the officers recorded this as a refusal to submit to the test.

At approximately 6:50 pm, Butler and Johns carried Hollenbaugh to holding cell 1-A. Officers Rotolo and Goon left at that point and had no further contact with Hollenbaugh. Defendant Johnson had also left the jail by that time. Prior to leaving, Johnson recommended that the defendants put Hollenbaugh on a 15 minute observation schedule.

At the same time, the defendants cite to only a few more interactions with Hollenbaugh throughout the rest of the evening. First, almost immediately after placing him in the holding cell,

---

[12/] Amos dep. 13, 69:19-69:21, 79:18.

[13/] Butler dep. 112-115.

[14/] Rotolo dep. 118:11-119:5.

[15/] *Id.* 119:13-119:14.

-7-

Case No. 5:05-cv-207
Gwin, J.

Defendants Johns and Butler decided to test Hollenbaugh's blood pressure once more.  Butler

claims, however, that upon entering the cell, he saw Hollenbaugh smiling at him and decided not

to attempt the test.[16]  Johns apparently had no further contact with Hollenbaugh, but Butler claims

to have checked on him three more times.  At approximately 10:00 pm, Butler entered the cell again

and saw Hollenbaugh sitting up on the middle bunk.  According to Butler, Hollenbaugh told him that

he thought he had food poisoning.  Butler and another inmate then allegedly exchanged comments

about Hollenbaugh being intoxicated and Butler left the cell.[17]  Twice more between 10:00 pm and

12:00 am Butler saw Hollenbaugh when he brought two more inmates into the cell.  Both times,

Hollenbaugh was lying down on his back.[18]

      Defendant Ott also claims to have observed Hollenbaugh three times after the defendants put

him in the holding cell.  Around 7:15 pm she looked in the cell and viewed Hollenbaugh lying on

his side.[19]  Then, sometime between 8:00 and 9:00 pm, she entered the cell to give Hollenbaugh his

tickets.  According to Ott, Hollenbaugh was lying on his back with his hand over his eyes.[20]  Finally,

at some point between 9:00 and 9:30 pm, Ott heard someone vomiting in the cell.[21]  When she

entered, she found Hollenbaugh sitting in front of the toilet.  Hollenbaugh once again told Ott that

---

[16] Butler dep. 127.

[17] Butler dep. 188-89.

[18] *Id*. 157-58.

[19] Ott dep. 192:7-192:12.

[20] *Id*. 194.

[21] *Id*. 200:11-200:14.

Case No. 5:05-cv-207
Gwin, J.

he thought he had food poisoning and needed to go to the hospital.[22]  She replied that he most likely had alcohol poisoning, but claims she meant it facetiously.  She then left the cell and had no further contact with Hollenbaugh.

The inmates in the cell with Hollenbaugh testified that he vomited throughout the night and that they tried without avail to get the defendants' attention.[23]  One of the inmates, Amos, testified that Hollenbaugh said his right arm hurt, though there is no evidence that Amos reported this to the defendants.  Amos did testify that he tried to get the defendants' attention and told certain unnamed officers that Hollenbaugh was sick and needed help.[24]  Amos further testified that when he and the other inmates tried to get the defendants' attention, the officers lowered the blinds over the window to the cell and simply laughed.[25]

Early the next morning, one of the Wayne County Jail personnel discovered that Hollenbaugh was dead.  The coroner's report revealed that Hollenbaugh died sometime between 11:30pm and 12:00 am.  The coroner also determined the cause of death to be cardiac arrest caused by coronary artery disease.

The plaintiff alleges that had the defendants sought medical treatment for Hollenbaugh, he would not have died.  They further claim that the defendants violated Hollenbaugh's constitutional rights by acting with deliberate indifference in their failure to seek such care.  Responding, the defendants argue that they believed Hollenbaugh was intoxicated and that they did not realize the

---

[22] *Id.* 204.

[23] Brigman dep. 13-18, Aug. 19, 2005; Amos dep. 22-25.

[24] *Id.* 26-29.

[25] *Id.* 43-44

Case No. 5:05-cv-207
Gwin, J.

seriousness of his condition.

## **LEGAL STANDARD**

Summary Judgment is appropriate where the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court enters summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that show the absence of a genuine issue of material fact. *Id.* at 323. A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)) Once the moving party satisfies its initial burden, the burden shifts to the non-moving part .

y who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-moving party cannot avoid summary judgment by resting on its pleadings or reasserting its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court views the factual evidence and draws reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d

-10-

Case No. 5:05-cv-207
Gwin, J.

561, 563 (6th Cir. 1997).  The Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal punctuation omitted).  "The mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (citation and internal punctuation omitted).  The Court "is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## DISCUSSION

The plaintiff alleges that the defendants violated Hollenbaugh's constitutional rights by acting with deliberate indifference to Hollenbaugh's health and well being.  Section 1983 gives this Court jurisdiction over actions seeking recovery for constitutional deprivations suffered under the color of state law.  42 U.S.C. § 1983 (stating that every person who, under color of state law, causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ."); *Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir. 1995) ("In order to prevail in a section 1983 action, the plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or other federal laws.").

I.       Individual Capacity Claims

The plaintiff sues Defendants Rotolo, Johnson, Ott, Butler, Johns, and Schuler, in their individual capacities.  These defendants argue that their actions did not amount to a violation of

-11-

Case No. 5:05-cv-207
Gwin, J.

Hollenbaugh's constitutional rights.  They also argue that they are entitled to qualified immunity as to all § 1983 claims.

The doctrine of qualified immunity shields state and local actors from liability based on their discretionary acts.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages").  In doing so, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin.  *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damage suits from entering public service.").

Nevertheless, state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person would have known.  *Harlow*, 457 U.S. at 818 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  The doctrine thus  offers no solace to "the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Sixth Circuit Court of Appeals set forth a three-part test for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally we determine whether the Plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

Case No. 5:05-cv-207
Gwin, J.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (internal quotation marks omitted) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

Accordingly, in analyzing the plaintiff's § 1983 claims, the Court looks first to whether the plaintiff offers sufficient evidence of a constitutional violation. If so, the Court decides whether the violation involved a clearly established constitutional right of which a reasonable person would have known. And third, the Court looks at whether the defendants' actions were objectively unreasonable.

The plaintiff claims that the defendants' denial of medical care to Hollenbaugh violated Hollenbaugh's Fifth, Eighth, and Fourteenth Amendment rights. As Hollenbaugh was a state pretrial detainee in state custody, the plaintiff's claim properly falls under the Fourteenth Amendment.[26]

The Due Process Clause of the Fourteenth Amendment gives pretrial detainees the same rights as provided to convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Barber v. City of Salem*, 953 F.2d 232, 235 (6th Cir. 1992). The Supreme Court has held that deliberate indifference to the serious medical needs of a prisoner is a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As a result, a pretrial detainee also has a limited right to medical assistance while in custody. Specifically, the Sixth Circuit has

---

[26] The plaintiff also alleges the defendants violated Hollenbaugh's Eighth Amendment rights. However, the Eighth Amendment does not apply to pretrial detainees. *See Estate of Harbin v. City of Detroit*, No. 03-2486, 2005 WL 2108326 (6th Cir. 2005) ("Though the Eighth Amendment's prohibition of cruel and unusual punishment does not apply to pretrial detainees, the Fourteenth Amendment's Due Process Clause affords pretrial detainees a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners."). The plaintiff also alleges that the defendants' denial of medical care amounted to punishment in violation of the Fifth Amendment. Ordinarily, the Fifth Amendment applies to *federal* rather than state pretrial detainees. *See Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000). However, in *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), the Sixth Circuit applied the Fifth Amendment's prohibition against the punishment of pretrial detainees to a state pretrial detainee. To this extent, the Sixth Circuit apparently recognizes such a claim apart from a claim under the Fourteenth Amendment. In the present case, however, the Court finds that while the defendants may have acted with deliberate indifference toward Hollenbaugh, the plaintiff fails to point to sufficient evidence to show that the defendants intended to *punish* Hollenbaugh. *See id.* at 687. The Court thus finds that the plaintiff's claim is more properly stated under the Fourteenth Amendment.

-13-

Case No. 5:05-cv-207
Gwin, J.

held that when "'circumstances are clearly sufficient to indicate the need of medical attention for injury or illness', anyone who is incarcerated, whether for a serious crime or to sleep off a drunk, has the due process right to adequate medical care." *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir. 1989) (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir.1972)).

To establish a violation of the right to adequate medical assistance, a pretrial detainee must show that a government actor, operating with deliberate indifference, exposed the detainee to substantial risk of serious damage to the detainee's health. *See Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994). The standard for establishing deliberate indifference is rather demanding. For liability to attach, the government actor must know of and disregard a serious risk to the detainee's health. *See id.* at 837-38 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

Dealing first with Defendant Schuler, the Court finds the plaintiff fails to establish that she deliberately disregarded a known serious risk to Hollenbaugh's health. The defendants claim, and the plaintiff cannot contradict, that Schuler had only very limited contact with Hollenbaugh when Rotolo first brought him into the jail. It does not appear that Schuler ever directly interacted with Hollenbaugh or that she was even present for most of the relevant events.

In contrast, the Court finds that the plaintiff points to evidence sufficient to survive summary judgment as to the remainder of the defendants. Defendants Rotolo, Johns, Butler, Ott, and Johnson all dealt directly with Hollenbaugh and had opportunity to closely observe him. At one point or

-14-

Case No. 5:05-cv-207
Gwin, J.

another, Hollenbaugh made statements to each of these defendants, or at least in the presence of these defendants, that he was not feeling well, thought he had the flu or food poisoning, was having chest pains, and wanted to go to the hospital.

The defendants maintain that they believed Hollenbaugh to be drunk and to be faking illness. There is, however, sufficient evidence to create a genuine issue of fact as to whether the defendants knew that Hollenbaugh was seriously ill. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, *including inference from circumstantial evidence . . .* and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (emphasis added).

The defendants suggest that they could not have known of the risk because Hollenbaugh never reported having a heart condition and did not directly state that he was having a heart attack. Apparently, the defendants take the position that Hollenbaugh would have had to self-diagnose his heart condition and impending heart attack in order for the defendants to be aware of a substantial risk to Hollenbaugh's health.

This is inconsistent with both common sense and with the standard for demonstrating deliberate indifference. The plaintiff does not have to show that the defendants knew of the exact medical risk threatening Hollenbaugh. The plaintiff need only point to sufficient evidence that the defendants were aware of facts from which they could draw the inference that a substantial risk of harm existed and that they indeed drew such an inference. *Farmer*, 511 U.S. at 837. In the present case, there is ample evidence that Hollenbaugh elicited signs of a serious risk to his health. For example, he was incoherent, had difficulty standing, and kept trying to lie down. He vomited several

-15-

Case No. 5:05-cv-207
Gwin, J.

times throughout the night.  He repeatedly complained that he felt ill and thought he had the flu or food poisoning.  More importantly, he stated that his chest hurt and at least twice said to go to the hospital.  Essentially, he did everything short of stating that he was having a heart attack.

The defendants' own reactions to Hollenbaugh indicate their awareness that he required medical care.  Defendants Ott and Butler attempted to take Hollenbaugh's blood pressure several times.  These defendants give no sufficient explanation why, if they only believed Hollenbaugh to be drunk, they would attempt the blood pressure tests on several occasions.  Additionally, Johnson's suggestion that the defendants put Hollenbaugh on 15 minute checks evidences concern that Hollenbaugh was in fact suffering from a serious medical condition and needed to be watched closely.

The defendants did nothing more to investigate Hollenbaugh's condition.  They clearly took Hollenbaugh's complaints seriously enough to try to test his blood pressure several times.  Yet, when the blood pressure machine continued to read error, they failed to contact the on-call nurse to either ask her to examine Hollenbaugh or at least elicit advice as to how they should proceed.  Butler was able to manually obtain a brief pulse, but only for seconds.  He admits that his reading was a mere estimate.  That he subsequently decided to try again to obtain Hollenbaugh's pulse using the blood pressure machine shows also that he remained concerned about Hollenbaugh's condition.  Butler claims that he ultimately decided to forgo the test because he did not feel that Hollenbaugh was in serious need of medical assistance.  But his testimony reveals no event that specifically assuaged his apparent concern.  Instead, Butler's statement that he decided not to administer the test after Hollenbaugh smiled at him is evidence that Butler simply chose not to deal with Hollenbaugh.

The defendants additionally acted inconsistently with Wayne County's own policies

-16-

Case No. 5:05-cv-207
Gwin, J.

regarding medical care for inmates.  Specifically, Wayne County Jail personnel are required to diligently observe an individual upon admission to the jail.  If they notice signs of a serious illness, they are required to send that individual to a hospital.[27]

In the present case, the defendants simply put Hollenbaugh in the holding cell and may or may not have checked on him on a frequent basis.  The evidence certainly presents a question as to whether the defendants actually did check on Hollenbaugh every 15 minutes, as they claim.[28]   In any case, the defendants provided little else in the way of basic care.  They did not, for instance, attempt to ascertain Hollenbaugh's temperature.  Nor, as stated above, did they call a nurse or any other medical professional.

Finding that the plaintiff points to sufficient evidence that Defendants Rotolo, Ott, Butler, Johns, and Johnson violated Hollenbaugh's Fourteenth Amendment rights, the court now turns to the remainder of the qualified immunity analysis.  First, the Court finds that the defendants should have been aware of Hollenbaugh's Fourteenth Amendment right to adequate medical care.  *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) ("[I]n general, the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established.").

Additionally, the Court finds that the defendants' failure to transfer Hollenbaugh to the hospital or at the very least to contact the on-call nurse to be objectively unreasonable.  Though

---

[27]  Ott dep. 109:12-110:23.

[28]  Deputy Johns, for example, testified that he did not actually see whether any of the defendants observed Hollenbaugh every 15 minutes.  Johns dep. 91:15-92:5.  Johns also testified that on some occasions the deputies keep check a sheet, which is basically a record of each time a deputy checks the inmate and an observation of what the inmate is doing at that time.  *Id*. 92:6-93:3.  On this particular occasion, the defendants kept no such record of their alleged observation of Hollenbaugh.  There is some evidence that Ott and Butler went into Hollenbaugh's cell at various points throughout the evening, but no indication that they checked on him every 15 minutes.

Case No. 5:05-cv-207
Gwin, J.

Hollenbaugh was allegedly intoxicated when arrested and brought to the Wayne County Jail, he was apparently adamant about his need of medical attention and his belief that he was suffering from a serious medical condition.  More than once, he communicated symptoms to the defendants that would have led a reasonable officer to conclude that they should at least elicit the opinion of a medical professional.  The court thus finds that the defendants are not entitled to qualified immunity and denies summary judgment as to the plaintiff's individual capacity claims against Defendants Rotolo, Ott, Butler, Johns, and Johnson.

II.     Official Capacity Claims Against the City of Wooster and Wayne County

The plaintiff also sues the City of Wooster, Wayne County, and all of the named defendants in their official capacities,[29] alleging that they maintained an official custom or policy resulting in the deprivation of Hollenbaugh's constitutional rights.  Specifically, the plaintiff alleges that Defendants Wooster and Wayne County failed to properly train its employees as to adequate standards and procedures for dealing with the medical needs of prisoners.  The plaintiff also claims that the defendants' general treatment of Hollenbaugh in and of itself evidences a custom or policy on the part of Wooster and Wayne County to deny prisoners adequate medical care.

While a municipality is subject to suit under § 1983, *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978), a municipality does not incur § 1983 liability based solely on the unconstitutional acts of its employees. That is, a municipality cannot be held liable on a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694-95.

---

[29] The plaintiff's claims against the named defendants in their official capacities are essentially claims against the local governments or municipalities.  *See Taylor v. Franklin County, Ky.*, 104 Fed. Appx. 531, 541 (6th Cir. 2004) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244 (6th Cir.1989)) ("A suit against an individual 'in his official capacity has been held to be a suit directly against the local government unit and may result in the municipality's liability."). As such, these claims are considered together with the plaintiff's claims against Wooster and Wayne County.

Case No. 5:05-cv-207
Gwin, J.

Rather, a plaintiff must show that the municipality's own policies or customs proximately caused the constitutional violation: "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

Turning first to the plaintiff's failure to train claim, the Court finds the plaintiff fails to present sufficient evidence to survive summary judgment.  A government entity incurs liability under § 1983 only when its failure to train served as the "moving force" behind an underlying constitutional violation. *Id*. at  658; *City of Canton*, 489 U.S. at 391 (stating that failure to train would not lead to municipal liability unless the plaintiff could prove that "deficiency in training actually caused the police officers' indifference to her medical needs"). Furthermore a plaintiff must show that the municipality's  failure to train its officers amounts to deliberate indifference to the rights of persons with whom the police came into contact. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir.1994) (citing *City of Canton*, 489 U.S. at 388-89).  "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.

As proof of the defendants' alleged failure to properly train city and county employees, the plaintiff points to little more than the defendants' alleged actions on the night in question.  Aside from this, the plaintiff relies heavily on the expert report of R. Paul McCauley, PhD, BCFE.  Dr. McCauley largely offers the opinion that the individual defendants' actions fell below the standard of care for monitoring detainees' health and safety.  He also indicates that properly trained officers

-19-

Case No. 5:05-cv-207
Gwin, J.

would have responded differently to a detainee presenting Hollenbaugh's symptoms.  However, Dr. McCauley does not claim to have reviewed the actual training policies and procedures of Defendants Wooster or Wayne County.  Nor does he point to any specific aspect of this training that he finds problematic.

McCauley did state that the defendant municipalities' failure to perform an internal investigation into the actions of the named defendants demonstrates an indifference to uncovering and remedying problems in training procedures.  However, the defendants maintain that the State of Ohio regularly reviews the policies and procedures of Wayne County and the Wayne County Jail.  Those policies and procedures were at relevant times and continue to be in compliance with State of Ohio mandates.  Additionally the Wayne County Jail is accredited by the National Commission of Correctional Healthcare.  The Wayne County defendants also claim that Wayne County Jail deputies receive training in CPR and first aid, in accordance with the American Red Cross training procedures.  The plaintiff provides no evidence that any of these procedures or policies are lacking.  Instead, the plaintiff simply alleges that the defendants did not act in accordance with these procedures.  The plaintiff thus fails to show that the defendant municipalities' training practices were so deliberately indifferent to the rights of detainees as to warrant liability under *Monell*.

The plaintiff additionally argues that the individual defendants' acts evince an official custom or practice of denying pretrial detainees adequate medical care.  "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice."  *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).  Such a practice gives rise to *Monell* liability only where it is "'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Doe v.*

-20-

Case No. 5:05-cv-207
Gwin, J.

*Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir.1996) (quoting *Monell*, 436 U.S. at 691).  In other words, the custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'"  *Id.* (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).

The Sixth Circuit has held that in the context of alleged failure to provide medical care, the plaintiff must show that the municipality engaged in a custom or practice of deliberate indifference to detainees' medical needs.  *See Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005).  It further stated that this "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures."  *Id.* (holding that a plaintiff who "failed to make the threshold showing of a clear and persistent pattern of mistreatment of detainees" could not establish a custom or policy of deliberate indifference).

As with the failure to train claim, the plaintiff presents almost no evidence that Wayne County or Wooster engaged in a custom of deliberate indifference toward detainees' medical needs.  Specifically, the plaintiff cites to no incidents other than the one in question.  Therefore, the record contains no evidence that either Wayne County or Wooster had knowledge of prior occasions where officers failed to properly respond to a detainee's medical needs.  A single incident possibly amounting to a violation of a detainee's rights does not amount to a pattern of mistreatment.  Nor does it evince acquiescence or implicit support of such behavior on the part of the defendants.  Because the plaintiff does not come forward with sufficient evidence of a policy or custom of constitutional violation, the Court thus grants summary judgment as to the plaintiff's § 1983 claims against Wayne County, Wooster, and the named defendants in their official capacities.

Case No. 5:05-cv-207
Gwin, J.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the defendants' motions for summary judgment as to the plaintiff's § 1983 claims against Wayne County, Wooster, the named defendants in their official capacities, and Defendant Schuler in her individual capacity.  However, the Court **DENIES** the defendants' motions as to the plaintiff's § 1983 individual capacity claims against Defendants Rotolo, Ott, Butler, Johns, and Johnson.  As a portion of the plaintiff's federal claims survive summary judgment, the Court retains jurisdiction over the plaintiff's state law claims.

IT IS SO ORDERED.


Dated: November 10, 2005                         s/            *James S. Gwin*
                                                 JAMES S. GWIN
                                                 UNITED STATES DISTRICT JUDGE